1
2
3
4
5
6
7
8

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NANCY BARR,<br><br>                              Plaintiff,<br><br>v.<br><br>LABORATORY CORPORATION OF<br>AMERICA HOLDINGS, et al.,<br><br>                              Defendants. | Case No.:  19-cv-1887-MMA (MDD)<br><br>**ORDER GRANTING IN PART AND<br>DENYING IN PART DEFENDANT'S<br>MOTION FOR SUMMARY<br>JUDGMENT**<br><br>[Doc. No. 26] |

Plaintiff Nancy Barr ("Plaintiff") brings this action against Laboratory Corporation of America Holdings ("Defendant" or "Labcorp") asserting California state law employment claims as well as violations of California Labor Code § 1102.5 and California Health and Safety Code § 1278.5.  *See* Doc. No. 1.  Labcorp moves for summary judgment in its entirety.  *See* Doc. No. 26. Plaintiff filed an opposition, to which Labcorp replied.  *See* Doc. Nos. 32, 43.[1]  The Court found this matter suitable for determination on the papers and without oral argument pursuant to Civil Local Rule

---

[1] In response to the Court's order on Plaintiff's motions to seal, *see* Doc. No. 44, Plaintiff refiled her opposition with redacted exhibits in support thereof, *see* Doc. No. 47.

7.1.d.1.  *See* Doc. No. 31.  For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** Labcorp's motion for summary judgment.

## I. BACKGROUND[2]

Plaintiff is a licensed medical doctor.  *See* Doc. No. 47-5 ("Pl. Decl.") at ¶ 1.  In 2014, she began providing pathology services to Labcorp at its San Diego laboratory (the "San Diego Lab").  *See* Doc. No. 26-1 ("Separate Statement of Undisputed Material Facts" or "SS") at No. 1.[3]  Labcorp operates a network of clinical laboratories that provide testing and diagnostic services.  *See* SS at No. 2.  From 2014 to 2016, Plaintiff was contracted to work for Labcorp through a third-party medical group, Affiliated Pathologists Medical Group, Inc ("APMG").  *See* SS at No. 3.  After APMG dissolved, Plaintiff and five other pathologists formed Southern California Pathology Medical Group ("SCPMG").  *See* SS at No. 4.  On April 1, 2016, Labcorp and SCPMG entered into a services agreement.  *See id.*  One year later, SCPMG disbanded, and Plaintiff individually entered into a one-year Pathology Services Agreement with Labcorp (the "Agreement").  *See* SS at No. 5.  The Agreement was for one year—set to expire on April 1, 2018—and called for 30-days' termination notice.  *See* SS at No. 5; Doc. No. 26-3 ("Kondon Decl.") at Ex. F.  The Agreement provided an automatic one-year renewal at

---

[2] These material facts are taken from Defendant's Separate Statement of Undisputed Material Facts and Plaintiff's responses thereto, as well as the supporting declarations and exhibits.  Facts that are immaterial or not genuinely disputed for purposes of resolving the current motion are not included in this recitation.  To the extent any such facts are nevertheless relevant to the Court's analysis, they are discussed as appropriate, *infra*.

[3] In response to Defendant's Separate Statement of Undisputed Material Facts, *see* Doc. No. 26-1, Plaintiff filed a "Separate Statement of *Disputed* Material Facts, *see* Doc. No. 47-1 ("Plaintiff's Responding Statement" or "PRS").  Plaintiff's responsive document is three hundred pages long.  Importantly, nearly every disputing response is merely a recitation of portions of the body of Plaintiff's opposition.  Moreover, many of her explanations are largely irrelevant.  For example, she disputes the statement that "Engle conducted a review of the pathologists' productivity and the distribution of cases among them," SS No. 11, on the basis that she was terminated in retaliation and not for business needs, *see* PRS at No. 11.  This, of course, is not a relevant or valid basis for disputing a fact concerning Sonya Engle's investigation, which does not mention Plaintiff's termination.  Accordingly, to the extent Plaintiff purports to dispute a statement but does not provide a relevant basis for doing so, the Court treats the statement as undisputed.

the end of the term unless expressly terminated.  *See id.*  The parties dispute whether the Agreement conferred on Plaintiff employee or independent contractor status.  *See* Doc. No. 26 at 9 n.1.

**A.    Specimen Mix-Up**

On April 30, 2018, Plaintiff notified her supervisor, Melissa Thompson ("Thompson"), of a potential "specimen mix-up."  SS at No. 16.  Sometime prior, Plaintiff became aware of inconsistent diagnoses for a specific patient—JZ.  *See* SS at No. 16.  In late March 2018, Plaintiff reported that JZ's pap smear was "abnormal" and "suspicious for squamous cell carcinoma."  SS at No. 17.  However, a subsequent biopsy and second procedure of JZ's tissue revealed only normal cells.  *See* SS at No. 18; Kondon Decl. at Exs. I, J.  Following this inconsistency, JZ's original pap smear was reprocessed and came back "negative" or "normal."  SS at No. 19.

Thompson subsequently investigated the discrepancy and in May 2018, concluded that it was the result of instrument processing error.  *See* SS at Nos. 20, 22.  Plaintiff disputes that Thompson conducted a thorough investigation and asserts that the specimen mix-up was not due to instrument processing error but instead "human or operator error resulting in somebody else's PAP smear being mislabeled as JZ's."[4]  PRS at No. 20.  Thompson did not report the specimen mix-up to anyone above her in management, including Sonya Engle.  *See* SS at No. 23.

**B.    Engle's Investigation**

In 2018, Labcorp's Vice President and General Manager for Southern California Sonya Engle ("Engle") began investigating Labcorp's productivity and was charged with review and optimization of the contract pathologists at the Southern California facilities,

---

[4] As explained, the parties dispute whether the inconsistent diagnosis was the result of human or instrument processing error.  For the sake of consistency, the Court refers to the event as the "specimen mix-up" but does not find that it was in fact the result of human error.  Whether the inconsistency was due to simple machine malfunction, as Labcorp contends, or human error subsequently followed by a cover-up, as Plaintiff maintains, is irrelevant.  Only Plaintiff's beliefs and resulting complaints are relevant to this action.

which included the San Diego Lab.  *See* Doc. No. 26-6 ("Engle Decl.") at ¶ 4; *see also* SS at Nos. 9–11.

In March 2018, upon reviewing the San Diego Lab's productivity, Engle concluded that it was contracting with two more pathologists than the workload justified. *See* SS at No. 12.  Engle's investigation also revealed an imbalance in the distribution of cases.  *See* SS at No. 12.  While pathologists are tasked with analyzing both cytology and biopsy specimens, Engle found that Plaintiff read almost exclusively cytology cases in 2017, and that she read more pap smears than the other pathologists.  *See* SS at Nos. 6–7.

Accordingly, Engle determined that with two fewer pathologists, the lab would work most efficiently with all cases evenly distributed.  *See* SS at No. 14.  Because Plaintiff was an "outlier among the pathologists," Engle recommended that Plaintiff be one of the pathologists terminated.  SS at No. 13.

Plaintiff disputes that the workload at the San Diego Lab justified terminations and that the lab would be more effective with an even distribution of cytology cases.  *See, e.g.*, Pl. Decl. at ¶¶ 51–55.  She also disputes that it was Engle's decision to terminate her.  *See* Doc. No. 47-3 ("Sottile Decl.") Ex. B at 351:15–21 ("Miss Engle said the decision was entirely Melissa's decision . . . .").

## C.   First Notice of Termination and Follow-Up Meetings

On June 29, 2018, Engle and Thompson met with Plaintiff to deliver her a notice of termination.  *See* SS at No. 24.  The parties dispute what was said during that meeting. *See, e.g.*, Sottile Decl. at Ex. B at 351:15–21.  Nonetheless, it is undisputed that during the meeting Plaintiff indicated that she had quality assurance concerns and requested a follow-up meeting.  *See* SS at No. 24.  At that time, Engle withdrew the notice of termination and scheduled a second meeting.  *See* SS at No. 25.

At the July 2, 2018 follow-up meeting, Plaintiff notified Engle of the specimen mix-up and indicated her belief that it had not been properly investigated.  *See* SS at No. 26.  The parties dispute whether Engle had prior knowledge of the situation.  *See* PRS at No. 23 ("Sonya Engle was in the office every day during the time of the

investigation.").  During the meeting, Plaintiff also expressed other concerns, including that Thompson had falsified data and "had not recorded, or had corrected, errors made by other pathologists."  SS at No. 27.  Engle had no prior knowledge of Thompson's alleged misconduct.  *See* SS at No. 27.  After the meeting, Engle investigated Plaintiff's claims by interviewing Thompson and Tiea Kesler, Labcorp's Vice President of Anatomic Pathology.  *See* SS at No. 28.  While Engle was satisfied that Thompson had properly investigated the specimen mix-up, she directed Engle to formally document her investigation.  *See* SS at No. 29; Doc. No. 26-6 ("Thompson Decl.") at Ex. B.

On August 16, 2018, Engle and Thompson met with Plaintiff to communicate Engle's investigation and findings.[5]  *See* SS at No. 30.  Immediately thereafter, Plaintiff called Labcorp's internal compliance hotline and the Center for Medicaid Services ("CMS") and lodged quality assurance complaints.[6]  *See* SS at No. 31.

**D.    Second and Final Notice of Termination**

On September 7, 2018, Engle and Thompson met with Plaintiff and presented her with a second notice of termination.  *See* SS at Nos. 32–33.  Upon receipt, Plaintiff informed Engle and Thompson of her internal and CMS complaints—information that neither Engle nor Thompson was previously aware of.[7]  *See* SS at No. 34.  The basis for Plaintiff's termination is at the center of this dispute.  *See e.g.*, SS at No. 14; Pl. Decl. at ¶¶ 124, 127.

---

[5] There is evidence that there was a prior follow-up meeting on July 13, 2018, between Plaintiff and Engle, wherein Engle communicated the same regarding her investigation. *See* Pl. Decl. at ¶ 92.  While it is unclear if this fact is disputed, it is immaterial to Plaintiff's claims.

[6] Plaintiff does not dispute that the meeting and complaints all took place on August 16, 2018. *See* PRS at Nos. 30, 31.  That said, Plaintiff via her declaration asserts that these events took place on August 15, 2018.  *See* Pl. Decl. at ¶¶ 121, 123.  This discrepancy is immaterial.

[7] Following her termination, in October 2018, Plaintiff made formal, written complaints to CMS and the College of American Pathologists.  *See* SS at Nos. 35–36.  These events are irrelevant.  Plaintiff does not assert them as protected activities and surely activities taken after her termination cannot logically provide the basis for her retaliation claims.  Accordingly, the Court will not address them in this Order.

1

## II. LEGAL STANDARD

2      "A party may move for summary judgment, identifying each claim or defense—or

3  the part of each claim or defense—on which summary judgment is sought.  The court

4  shall grant summary judgment if the movant shows that there is no genuine dispute as to

5  any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

6  P. 56(a).  The party seeking summary judgment bears the initial burden of establishing

7  the basis of its motion and of identifying the portions of the declarations, pleadings, and

8  discovery that demonstrate absence of a genuine issue of material fact.  *See Celotex Corp.*

9  *v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party has "the burden of showing the

10  absence of a genuine issue as to any material fact, and for these purposes the material it

11  lodged must be viewed in the light most favorable to the opposing party."  *Adickes v. S.*

12  *H. Kress & Co.*, 398 U.S. 144, 157 (1970).  A fact is material if it could affect the

13  "outcome of the suit" under applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

14  242, 248 (1986).  A dispute about a material fact is genuine if there is sufficient evidence

15  for a reasonable jury to return a verdict for the non-moving party.  *See id.*

16      If the moving party meets its burden, the nonmoving party must go beyond the

17  pleadings and, by its own evidence or by citing appropriate materials in the record, show

18  by sufficient evidence that there is a genuine dispute for trial.  *See Celotex*, 477 U.S. at

19  324.  The nonmoving party "must do more than simply show that there is some

20  metaphysical doubt as to the material facts . . .."  *Matsushita Elec. Indus. Co. v. Zenith*

21  *Radio Corp.*, 475 U.S. 574, 587 (1986).  A "scintilla of evidence" in support of the

22  nonmoving party's position is insufficient; rather, "there must be evidence on which the

23  jury could reasonably find for the [nonmoving party]."  *Anderson*, 477 U.S. at 252.

24  Moreover, "a party cannot manufacture a genuine issue of material fact merely by

25  making assertions in its legal memoranda."  *S.A. Empresa de Viacao Aerea Rio*

26  *Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982).

27

28

### III. EVIDENTIARY OBJECTIONS

In support of her opposition, Plaintiff submitted a declaration. *See* Pl. Decl. Labcorp subsequently filed fourteen evidentiary objections. *See* Doc. No. 43-1.[8] Labcorp objects to fourteen statements as improper opinion and legal conclusion, lacking foundation, and inadmissible hearsay. Plaintiff did not oppose or otherwise respond to Labcorp's evidentiary objections.

Labcorp objects to five statements (in whole or in part) on the basis that they are inadmissible hearsay. However, even if the statements do contain hearsay, they "are admissible for summary judgment purposes because they 'could be presented in an admissible form at trial.'" *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 846 (9th Cir. 2004) (quoting *Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003), *cert. denied sub nom. United States Bancorp v. Fraser*, 124 S. Ct. 1663 (2004)); *see also Hughes v. United States*, 953 F.2d 531, 543 (9th Cir. 1992). Accordingly, the Court **OVERRULES** the fourth, sixth, ninth, thirteenth, and fourteenth objections to Paragraphs 51, 77, 109, and 131 the extent they are based upon Federal Rule of Evidence 802.

Turning to the improper opinion, lack of foundation, and personal knowledge objections. Rule 56 requires that, before evidence can be considered on summary judgment, a proper foundation must be laid. *See Bias v. Moynihan*, 508 F.3d 1212, 1224 (9th Cir. 2007). Declarations submitted in support of, or in opposition to, a motion for summary judgment therefore "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). The personal knowledge

---

[8] Labcorp objected to Plaintiff's originally filed declaration, which the Court has since struck from the record. *See* Doc. No. 44. Accordingly, Labcorp's evidentiary objections are moot. Plaintiff then refiled her declaration, *see* Pl. Decl., and Labcorp did not lodge new objections. However, because the refiled declaration is identical to the previously filed one, the Court will nonetheless address Labcorp's objections.

1  requirement in Rule 56(e) can be met by inference.  *See Barthelemy v. Air Lines Pilots*

2  *Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990).

3      Labcorp objects to Paragraph 8, asserting that it is improper opinion and legal

4  conclusion.  To the extent Plaintiff offers this statement as evidence of the legal

5  conclusion that Plaintiff was an employee of Labcorp, as opposed to an independent

6  contractor, the Court **SUSTAINS** the objection.  Plaintiff cannot testify via declaration to

7  such a legal determination regarding her disputed employment status.

8      Labcorp objects to Paragraph 39.  In Paragraph 39, Plaintiff proffers that she

9  discovered that Thompson made several errors including falsifying and failing to

10  properly document data.  Labcorp asserts this statement is improper lay opinion and that

11  Plaintiff has no personal knowledge.  However, the paragraph plainly contains no

12  information outside of an ordinary lay person observation.  Moreover, the Court can infer

13  Plaintiff's personal knowledge from her over 30 years of experience and four years of

14  working at Labcorp, as well as via other statements in her declaration.  *See, e.g.*, Pl. Decl.

15  at ¶¶ 38, 40.  Accordingly the Court **OVERRULES** Labcorp's objections to Paragraph

16  39.

17      Labcorp objects to Paragraphs 49 and 53, wherein Plaintiff states that another

18  pathologist, Dr. Williams, also reviewed nearly exclusively (some 90% of) cytology

19  specimens.  Labcorp objects on the bases that these statements lack foundation and

20  personal knowledge.  The Court can reasonably infer that Plaintiff had personal

21  knowledge of her colleagues' caseloads.  Accordingly, the Court **OVERRULES** the

22  objections to Paragraphs 49 and 53.

23      In Paragraph 54, Plaintiff disputes Engle's assertion that it would be more effective

24  to evenly distribute cytology specimens.  Labcorp asserts that Plaintiff lacks the personal

25  knowledge and foundation to make this statement.  The Court can infer Plaintiff's

26  knowledge of her colleague's qualifications.  Moreover, Plaintiff can opine on the

27  effectiveness of Engle's proposed distribution.  Accordingly, the Court **OVERRULES**

28  Labcorp's objections to Paragraph 54.  The Court notes, however, that it does not accept

this statement for the fact that Engle's proposed distribution was objectively ineffective or incorrect.

Labcorp objects to Paragraphs 65, 66, 103, 104, and 105.  These paragraphs go to the heart of this case.  Through these paragraphs, Plaintiff details how a specimen mix up occurred, resulting in a patient receiving a false positive report of cancer.  Contrary to Labcorp's assertions, Plaintiff has set forth sufficient facts to establish her knowledge of these events.  Plaintiff was directly responsible for reviewing the specimens in question.  *See, e.g.*, Pl. Decl. at ¶ 58.  Moreover, the Court, in weighing the evidence on summary judgment, does not accept any statements in Plaintiff's declaration for the truth that a specimen mix-up in fact occurred because it is irrelevant.  Instead, it is sufficient that Plaintiff believed the error was due to a specimen mix-up, as opposed to instrument error as Labcorp maintains, and complained about it.  Accordingly, the Court **OVERRULES** the objections to Paragraphs 65, 66, 103, 104, and 105.

As to Paragraph 77, to the extent Plaintiff claims that Thompson previously "ignored the law," Pl. Decl. at ¶ 77, the Court **SUSTAINS** the objection.  There is no basis for the legal conclusion that Thompson had previously broken any laws.  That said, the Court **OVERRULES** the remaining objections and accepts this statement for the fact that Plaintiff believed Thompson had made prior errors leading her to be concerned that a proper investigation was not undertaken.

## IV. DISCUSSION

Defendant moves for summary judgment in its entirety.  Accordingly, the Court addresses each of Plaintiff's claims in turn.

### A. California Labor Code Section 1102.5(b)

California Labor Code § 1102.5(b) provides that an employer shall not retaliate against an employee for disclosing information that the employee has reasonable cause to believe constitutes a violation of state or federal statute, or a violation of or non-compliance with a local, state, or federal rule or regulation.  *See* Cal. Labor Code § 1102.5(b).  Accordingly, a claim under section 1102.5(b) can only be brought by an

employee against their employer.  *See, e.g.*, *Bennett v. Rancho Cal. Water Dist.*, 248 Cal. Rptr. 3d 21, 31 (Ct. App. 2019) (explaining that a "prerequisite to asserting a violation of Labor Code section 1102.5 is the existence of an employer-employee relationship at the time the allegedly retaliatory action occurred") (internal citation and quotation marks omitted).

Labcorp concedes for the sole purpose of summary judgment that Plaintiff can proceed under § 1102.5(b) and "reserves" the right to argue that Plaintiff was an independent contractor, should the merits of the claim survive summary judgment.[9]  Doc. No. 26 at 17 n.2.[10]  Instead, Labcorp argues that Plaintiff's claim fails because she cannot meet her prima facie burden, or alternatively, cannot overcome Labcorp's legitimate, nondiscriminatory reason for terminating her contract.  *See id.* at 10, 14.

The parties agree that the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to Plaintiff's section 1102.5 claim.  *See* Doc. Nos. 26 at 18, 47 at 21.  Under the *McDonnell* framework, Plaintiff must make a prima facie case of retaliation, at which point the burden shifts to Labcorp to articulate a legitimate, nondiscriminatory reason for its employment actions.  *See McDonnell*, 411 U.S. at 802–04.  Then, in order to survive summary judgment, Plaintiff must produce evidence that Labcorp's "proffered nondiscriminatory reason is merely a pretext for [retaliation]."  *Pham v. Bd. of Regents of the Univ. of Cal.*, No. 19-16541, 2021 U.S. App. LEXIS 14905, at *2 (9th Cir. May 19, 2021) (quoting *Weil v. Citizens Telecom Servs.*

---

[9] The Court initially ordered supplemental briefing on the issue of Plaintiff's classification as an employee versus independent contractor.  *See* Doc. No. 48.  The Court's reference to *Borello* in that Order is not an indication of the Court's opinion that the *Borello* test is the applicable standard.  The Court is aware that the parties disagree on several legal issues, including the proper test, whether California Labor Code § 2775(b)(1) applies, and whether Plaintiff was prohibited from being an employee under California law, *see* Cal. Labor Code § 2775(b)(2)–(3).  The parties do appear to agree, however, that the question of Plaintiff's status is a mixed one of law and fact.  *See generally* Doc. Nos. 49, 51.  Accordingly, the parties should be prepared that the Court will address and resolve this issue prior to trial, during the motions in limine stage.

[10] All citations to electronically filed documents refer to the pagination assigned by the CM/ECF system.

1   *Co., LLC*, 922 F.3d 993, 1002 (9th Cir. 2019)).

2         *a.*     *Plaintiff's Prima Facie Burden*

3        In order to plead a prima facie case of retaliation, a plaintiff must show that:

4   (1) she engaged in a protected activity; (2) her employer subjected her to an adverse

5   employment action; and (3) there is a causal link between the protected action and the

6   adverse action. *See Patten v. Grant Joint Union High Sch. Dist.*, 37 Cal. Rptr. 3d 113,

7   117 (Ct. App. 2005); *see also Tam v. Qualcomm, Inc.*, 300 F. Supp. 3d 1130, 1148 (S.D.

8   Cal. 2018). "The employee must have an actual belief that the employer's actions were

9   unlawful and the employee's belief, even if mistaken, must be reasonable." *Tam*, 300 F.

10  Supp. 3d at 1148 (citing *Carter v. Escondido Union High Sch. Dist.*, 56 Cal. Rptr. 3d 262,

11  270 (Ct. App. 2007)).

12       Labcorp does not argue that Plaintiff fails to establish the first two elements.  To be

13  sure, Plaintiff provides evidence that she undertook the following protected activities:

14  (1) Plaintiff reported to management that Thompson failed to include various errors in the

15  Clinical Lab Improvement Act ("CLIA") report, *see* Pl. Decl. at ¶¶ 38, 40; (2) Plaintiff

16  reported to management that Thompson falsified data on other mandatory reports, *see id.*

17  at ¶¶ 39, 40; (3) Plaintiff reported other pathologists' mistakes to Thompson, who did not

18  report or correct them, *see id.*; (4) Plaintiff reported the specimen mix-up to management,

19  *see id.* at ¶ 72; (5) Plaintiff reported the specimen mix-up to Engle, *see id.* at ¶ 91; (6)

20  Plaintiff made a complaint to Labcorp's internal hotline, *see id.* at ¶ 121; and (7) Plaintiff

21  made a complaint to CMS, *see id.* at ¶ 120.  Moreover, it is undisputed that Labcorp

22  terminated Plaintiff.  *See e.g.*, Kondon Decl. at Ex. M.

23       Instead, Defendant argues that Plaintiff cannot establish the third element—

24  causation—because: (1) the majority of the protected activities took place after Labcorp's

25  first notice of termination; and (2) Engle—the decision maker with respect to her

26  termination—was unaware that Plaintiff had undertaken these activities prior to her initial

27  decision to terminate her.  *See* Doc. No. 26 at 11, 14.

28       Beginning with the former, Labcorp's timing attack on causation is tainted by the

assumption that the subject retaliatory action is the first notice of termination.  However, the first notice of termination—which was admittedly withdrawn—does not constitute an adverse employment action as a matter of law.  *See Nunez v. City of L.A.*, 147 F.3d 867, 875 (9th Cir. 1998) (explaining that a mere threat of termination is not an adverse employment action); *see also Helgeson v. Am. Int'l Grp., Inc.*, 44 F. Supp. 2d 1091, 1098–99 (S.D. Cal. 1999) ("Defendants' mere threat to lay-off plaintiff cannot be an adverse employment action, especially when the threat is immediately rescinded. A temporally limited threat to take action is not the equivalent of taking that action."); *Van v. Language Line Servs.*, No. 14-CV-03791-LHK, 2016 U.S. Dist. LEXIS 73510, at *65 (N.D. Cal. June 6, 2016) (explaining that, "[t]o be actionable, an adverse employment action must 'materially affect the terms and conditions of employment.'") (quoting *Yanowitz v. L'Oreal USA, Inc.*, 32 Cal. Rptr. 3d 436, 453 (2005)).  Instead, "to be actionable, the retaliation must result in a substantial adverse change in the terms and conditions of the plaintiff's employment."  *Akers v. Cty. of San Diego*, 116 Cal. Rptr. 2d 602, 612 (Ct. App. 2002).  Accordingly, the Court concludes as a matter of law that the adverse employment action in question is limited to Plaintiff's second notice of termination, which took place on September 7, 2018.  *See* Kondon Decl. at Ex. M.

With that in mind, the Court turns to the timing of the protected activities. It appears undisputed that Plaintiff's complaints to management regarding the reporting errors—by both Thompson and other pathologists—took place in 2017.  *See, e.g.*, Pl. Decl. at ¶¶ 38, 40 ("In late 2017, I had a meeting with Bob Fogerson where we talked about these issues").  Moreover, it is undisputed that Plaintiff reported the specimen mix-up to Thompson on April 30, 2018.  *See* SS at No. 16.  It is further undisputed that Plaintiff reported Thompson's report falsifications and the specimen mix-up to Engle on July 2, 2018, *see* SS at Nos. 26, 27, and that Plaintiff made the internal hotline and CMA complaints on August 16, 2018, *see* SS at No. 31.  All of these activities took place prior to September 7, 2018.  Accordingly, the Court **DENIES** Labcorp's motion for summary judgment on this basis.

Turning to Labcorp's second argument, Labcorp asserts that Engle was the sole decision-maker responsible for Plaintiff's termination and that, because she was unaware of many of the protected activities, they cannot be causally linked to Plaintiff's termination.  However, according to Plaintiff, Thompson made the decision to terminate her.  Plaintiff testified that

> Miss Engle said the decision was entirely Melissa's decision, and I was very surprised by that.  And I kept pressing the two of them, Melissa, Melissa, this was your decision, Melissa?  I said did you get input from any other doctors as to your decision to fire me?  And Melissa said no, this was entirely my decision.

Doc. No. 47-3 ("Sottile Decl.") Ex. B at 351:15–21.  Accordingly, there is a genuine issue of material fact whether Engle was the sole decision-maker, or if Thompson was responsible for or otherwise involved in the decision.  The Court therefore **DENIES** Labcorp's request for summary judgment on this basis.

It is undisputed, however, that neither Engle nor Thompson knew of Plaintiff's internal hotline and CMS complaints prior to the second notice of termination.  *See* SS at No. 34.  Accordingly, even accepting Plaintiff's version of events—that Thompson was responsible for her termination—these activities cannot be causally linked to her termination.  The Court therefore finds that Plaintiff fails to meet her prima facie burden as to those two protected activities and **GRANTS** Labcorp's motion for summary judgment in this respect.

In sum, the Court finds that Plaintiff has met her prima facie burden with respect to the following activities: (1) reporting various reporting errors to management, *see* Compl. at ¶¶ 28–29; (2) reporting Thompson's data falsification and errors, *see id.* at ¶¶ 33–34; (3) reporting other pathologists' errors to Thompson, *see id.* at ¶ 37; and (4) reporting the specimen mix-up to management, including Engle, *see id.* at ¶ 51, 59.

### b.    *Labcorp's Legitimate, Non-Discriminatory Explanation*

Labcorp proffers that strategic business decisions led to Plaintiff's termination.  As

discussed above, according to Engle, the volume of work at the San Diego Lab did not justify the number of pathologists servicing it. *See* SS at No. 12; Engle Decl. at ¶ 4. After an investigation, Labcorp—Engle specifically—determined that having fewer pathologists with a more even distribution of caseload was the best course for efficiency. *See* SS at No. 12; Engle Decl. at ¶ 6. Accordingly, after reviewing the pathologists' case history, Engle determined that Plaintiff's high volume of cytology specimens warranted termination. *See* SS at Nos. 13–14; Engle Decl. at ¶ 7. Testimony from other persons at Labcorp, such as Thompson, supports this explanation. *See* Sottile Decl. at Ex. C at 42:18–21. The Court finds that this is a legitimate, non-discriminatory explanation for the decision to terminate Plaintiff, and that Labcorp has therefore met its burden.

### c. Evidence that Labcorp's Explanation is Merely Pretextual

Having decided that Plaintiff has met her prima facie burden, and Labcorp has met its burden in response, in order to survive summary judgment, Plaintiff must produce evidence that Labcorp's proffered nondiscriminatory reason for terminating her is merely a pretext for retaliation. *See Weil*, 922 F.3d at 1002. As the Ninth Circuit in *Weil* explained, "[v]ery little . . . evidence is necessary to raise a genuine issue of fact regarding an employer's motive; any indication of discriminatory motive . . . may suffice to raise a question that can only be resolved by a factfinder." *Id.* (quoting *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004)). "[A] plaintiff can prove pretext in two ways: (1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1127 (9th Cir. 2000) (quoting *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998)).

The Court concludes that Plaintiff raises a genuine material issue of fact with respect to whether Labcorp's explanation is merely a pretext for retaliation.

First, Engle testified that she decided to terminate two persons at the San Diego Lab was because the workload did not justify keeping all contracted pathologists. *See,*

*e.g.*, Engle Decl. at ¶ 4 ("This initiative was the result of an imbalance between the number of pathologists actually needed to handle the labs' cases and the number being contracted by LabCorp at the time.").  However, Plaintiff testified that the San Diego lab was consistently busy.  *See, e.g.*, Pl. Decl. at ¶¶ 48, 51.  Moreover, according to Plaintiff, a former colleague at Labcorp named Enrico Lopez informed her that immediately after her termination, Labcorp hired two new pathologists.  *See* Pl. Decl. at ¶ 131.  Thompson and Dr. Francis Chiricosta also confirmed that that a few months after Plaintiff was terminated, Labcorp hired another pathologist.  *See* Sottile Decl. at Ex. C at 43:22–23; Ex. F at 66:14–24.  This certainly raises a factual question regarding the legitimacy of Labcorp's proffered business needs explanation.[11]

Second, Engle testified that she identified Plaintiff as one of the two contracts to terminate due to Plaintiff's disproportionate reading of cytology specimens.  *See* Engle Decl. at ¶¶ 6–8.  However, Plaintiff testified that another pathologist at Labcorp also reviewed "nearly exclusively Cytology specimens."  *See* Pl. Decl. at ¶¶ 49, 53.  This raises a triable issue as to why Labcorp chose Plaintiff as one of the contracts to terminate.  Therefore, Plaintiff has produced evidence sufficient to create a genuine issue of material fact as to whether Labcorp's explanation for her termination was legitimate or in retaliation.  Accordingly, the Court **DENIES** Labcorp's motion for summary judgment as to Plaintiff's retaliation claim.

**B.    California Health and Safety Code Section 1278.5**

In addition to the whistleblower protection provided by the California Labor Code, California also provides specific protection to health care workers.  *See* Cal. Health & Saf. Code § 1278.5(a).  Pursuant to California Health and Safety Code § 1278.5:

A health facility shall not discriminate or retaliate, in any manner, against a

---

[11] Moreover, the Court notes that despite referencing (and introducing as Exhibit A) a "PowerPoint presentation" purportedly reflecting Engle's investigation and findings, *see* Engle Decl. at ¶ 6, there is no PowerPoint attached to Engle's declaration as Exhibit A.  Accordingly, there is no documentary evidence supporting Engle's investigation as a legitimate explanation for Plaintiff's termination.

patient, employee, member of the medical staff, or other health care worker of the health facility because that person has done either of the following:

(A) Presented a grievance, complaint, or report to the facility, to an entity or agency responsible for accrediting or evaluating the facility, or the medical staff of the facility, or to any other governmental entity.

(B) Has initiated, participated, or cooperated in an investigation or administrative proceeding related to the quality of care, services, or conditions at the facility that is carried out by an entity or agency responsible for accrediting or evaluating the facility or its medical staff, or governmental entity.

Cal. Health & Saf. Code § 1278.5(b)(1)(A)–(B).  A "health facility" is defined as

a facility, place, or building that is organized, maintained, and operated for the diagnosis, care, prevention, and treatment of human illness, physical or mental, including convalescence and rehabilitation and including care during and after pregnancy, or for any one or more of these purposes, for one or more persons, to which the persons are admitted for a 24-hour stay or longer.

Cal. Health & Saf. Code § 1250.

Labcorp asserts that it is not a "health facility" as defined by the statute and therefore it is entitled to summary judgment on this claim.  Plaintiff argues in response that Labcorp is a health facility because it provides "ancillary services to doctors for the diagnosis, care, prevention, and treatment of human illness, such as cancer etc."  Doc. No. 32 at 30.

It is undisputed that Labcorp "operates a network of clinical laboratories" that "provide testing and diagnostic services."  SS at No. 2.  Accordingly, it is a facility operated for the diagnosis of human illnesses, as contemplated by the statute.  However, it is also undisputed that Labcorp does not admit *at least one person* for *at least 24 hours*, *see* SS at No. 2, as the statute requires, *see* Cal. Health & Saf. Code § 1250.

1  Accordingly, the Court finds as a matter of law that Labcorp is not a health facility as

2  defined by the California Health and Safety Code.[12]  Therefore, because the protection

3  guaranteed by section 1278.5 is only applicable to an employee at a health facility, *see*

4  *Goodin v. Chinese Hosp. Ass'n*, Case No. CGC-17-563179, 2019 Cal. Super. LEXIS

5  1389, at *2 (Cal. Super. Ct. Apr. 15, 2019); *Blum v. Sequoia Med. Assocs.*, CIV 526546,

6  2016 Cal. Super. LEXIS 8185, at *4 (Cal. Super. Ct. Feb. 9, 2016), Plaintiff's claim fails

7  as a matter of law.  Accordingly, the Court **GRANTS** summary judgment in favor of

8  Labcorp as to Plaintiff's Health and Safety Code § 1278.5 claim.

9  **C.    Intentional Infliction of Emotional Distress**

10         Plaintiff's third cause of action is for intentional infliction of emotional distress.

11  To prevail on an intentional infliction of emotional distress claim under California law, a

12  plaintiff must establish: "(1) extreme and outrageous conduct by the defendant with the

13  intention of causing, or reckless disregard of the probability of causing, emotional

14  distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual

15  and proximate causation of the emotional distress by the defendant's outrageous

16  conduct." *Avina v. United States*, 681 F.3d 1127, 1131 (9th Cir. 2012) (quoting *Hughes*

17  *v. Pair*, 95 Cal. Rptr. 3d 636, 651 (2009)) (internal quotation marks omitted).  "A

18  defendant's conduct is outrageous when it is so extreme as to exceed all bounds of that

19  usually tolerated in a civilized community." *Hughes*, 95 Cal. Rptr. 3d at 651 (internal

20

21  ---

[12] The only case Plaintiff cites to in support of her position is largely inapposite.  In *St. Myers v. Dignity*

22  *Health*, 257 Cal. Rptr. 3d 341, 352 (Ct. App. 2019), the Court of Appeal held that a third-party service
   provider that provided a hospital with "scheduling, patient registration, health information management .

23  . . billing, and collections" but "did not provide medical care" was not a health facility.  *St. Myers*, 257
   Cal. Rptr. 3d at 352.  Plaintiff argues that contrary to the third-party facility in *St. Myers*, Labcorp

24  provides ancillary services and therefore is a health facility.  But the Court in *St. Myers* plainly stated
   that a facility providing ancillary services is *not* a health facility.  *See id.*  Moreover, *St. Myers* did not

25  address the 24-hour admission requirement, which is Plaintiff's downfall.

26         Further, a review of California case law reveals no situation wherein a third-party pathology
   laboratory was deemed a facility under section 1250.  To the contrary, even facilities that appear more

27  akin to a traditional hospital have been deemed outside of the definition as a matter of law.  *See, e.g.*,
   *Kotler v. Alma Lodge*, 74 Cal. Rptr. 2d 721, 730 (Ct. App. 1998) ("a residential care facility which

28  provides only incidental medical services is *not* a health facility.").

citations and quotation marks omitted).

In applying this cause of action to the context of personnel management, the California Court of Appeal has held that

> [m]anaging personnel is not outrageous conduct beyond the bounds of human decency, but rather conduct essential to the welfare and prosperity of society. A simple pleading of personnel management activity is insufficient to support a claim of intentional infliction of emotional distress, even if improper motivation is alleged. If personnel management decisions are improperly motivated, the remedy is a suit against the employer for discrimination.

*See Janken v. GM Hughes Elecs.*, 53 Cal. Rptr. 2d 741, 756 (Ct. App. 1996).

Labcorp argues that Plaintiff did not endure any "extreme or outrageous conduct" that "exceeds all bounds of decency." Doc. No. 26 at 26. As an initial matter, the Court agrees that Plaintiff's allegations that Thompson "t[old] Plaintiff not to interact with the cytotechnologists or the staff at the lab; frequently yell[ed] at plaintiff; deliberately decreas[ed] plaintiff's workload which resulted in a cut in pay; t[old] Plaintiff that she was now 'going to be proctored' and that she would no longer be allowed to do certain cases," Compl. at ¶ 40, even if true, do not rise to the level of extreme and outrageous required for redress and thus are not the kind of actions that support an intentional infliction of emotional distress claim. Accordingly, to the extent Plaintiff bases her claim on these actions, the Court **GRANTS** Labcorp's motion.

Plaintiff does not appear to base her claim on these actions, however. Instead, Plaintiff argues that there is a triable issue of fact whether her termination—"for illegal reasons and then lying to cover it up"—was extreme and outrageous. Doc. No. 32 at 30.

The law is clear that termination without more is insufficient for an intentional infliction of emotional distress claim. *See e.g.*, *Unterberger v. Red Bull N. Am., Inc.*, 75 Cal. Rptr. 3d 368, 376 (Ct. App. 2008). Termination may be considered outrageous depending on the surrounding circumstances. *See Maffei v. Allstate Cal. Ins. Co.*, 412 F. Supp. 2d 1049, 1057 n.4 (E.D. Cal. 2006). For example, *Alcorn v. Anbro Engineering,*

*Inc.*, 86 Cal. Rptr. 88 (1970), an African American employee was permitted to pursue an intentional infliction of emotional distress claim because he was fired in a despicable manner when his supervisor did so while shouting various racial epithets.  86 Cal. Rptr. 88 at 91.

Unlike the circumstances in *Alcorn*, Plaintiff's only added circumstance is Labcorp's allegedly illegal motive and cover-up.  This is insufficient.  The cases Plaintiff relies on are largely inapposite.  *See id.* at 92 n.5 (explaining that "liability 'does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities'"); *Myers v. Trendwest Resorts, Inc.*, 56 Cal. Rptr. 3d 501 (Ct. App. 2007); *Renteria v. Cty. of Orange*, 82 Cal. App. 3d 833, 842 (1978); *Schneider v. TRW, Inc.*, 938 F.2d 986, 992–93 (9th Cir. 1991).  Moreover, Plaintiff fails to address the line of California cases making clear that "personnel management activity is insufficient to support a claim of intentional infliction of emotional distress, *even if* improper motivation is alleged."  *Janken*, 53 Cal. Rptr. 2d at 756. (emphasis added).  Further,

> In evaluating whether the defendant's conduct was outrageous, it is 'not enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.

*Helgeson*, 44 F. Supp. 2d at 1095 (quoting *Cochran v. Cochran*, 76 Cal. Rptr. 2d 540, 545 (Ct. App. 1998)).

Accordingly, while there may be a triable issue of fact as to the motive behind Plaintiff's termination, the issue is irrelevant to her intentional infliction of emotional distress claim because under California law, improper or even illegal motives do not make a termination extreme or outrageous.  Instead, Plaintiff may seek redress under the statutory retaliation provisions, *see Janken*, 53 Cal. Rptr. 2d at 756, which she does.  The Court therefore finds that Plaintiff's intentional infliction of emotional distress claim premised on her allegedly unlawful termination fails as a matter of law.  *See id.*; *see also*

1   *Walker v. Boeing Corp.*, 218 F. Supp. 2d 1177, 1186 (C.D. Cal. 2002) ("Terminating an

2   employee for improper or discriminatory reasons, like many other adverse personnel

3   management decisions, is insufficiently extreme or outrageous to give rise to a claim for

4   intentional infliction of emotional distress."); *Helgeson*, 44 F. Supp. 2d at 1095

5   ("Performance reviews, counseling sessions, lay-off decisions, and work assignments are

6   all decisions that businesses make every day. . . . Even if these decisions were improperly

7   motivated, they fall far short of the necessary standard of outrageous conduct beyond all

8   bounds of decency."). Accordingly, the Court **GRANTS** summary judgment in

9   Labcorp's favor as to Plaintiff's intentional infliction of emotional distress claim.

10  **D.   Breach of the Implied Covenant of Good Faith and Fair Dealing**

11          Fourth, Plaintiff brings a claim against Labcorp for breach of the implied covenant

12  of good faith and fair dealing. Pursuant to California law, "[t]here is an implied covenant

13  of good faith and fair dealing in every contract that neither party will do anything which

14  will injure the right of the other to receive the benefits of the agreement." *3500*

15  *Sepulveda, Ltd. Liab. Co. v. Macy's W. Stores, Inc.*, 980 F.3d 1317, 1324 (9th Cir. 2020)

16  (quoting *Foley v. Interactive Data Corp.*, 254 Cal. Rptr. 211, 228 (1988)) (internal

17  quotation marks omitted). However, "California does not recognize a tort action for

18  breach of the implied covenant of good faith and fair dealing in an employment

19  relationship." *Schneider*, 938 F.2d at 991 (citing *Foley*, 254 Cal. Rptr. at 234–35).

20  "Because the implied covenant protects only the parties' right to receive the benefit of

21  their agreement, and, in an at-will relationship there is no agreement to terminate only for

22  good cause, the implied covenant standing alone cannot be read to impose such a duty."

23  *Schneider,* 938 F.2d at 991 (quoting *Foley*, 254 Cal. Rptr. at 238 n.39).

24          Plaintiff's claim is largely premised on the argument that Labcorp's decision to

25  terminate her was in bad faith and thus a breach of the implied covenant. *See* Compl. at ¶

26  206; *see also* Doc. No. 47 at 31. In order for her termination to provide the basis for this

27  claim, however, Plaintiff must identify a contractual provision in the Agreement that was

28

frustrated by the allegedly bad faith termination—*i.e.*, that the Agreement provided for for-cause termination.

The distinction between for-cause and at-will employment in the context of a good faith and fair dealing claim is an important one. "California law clearly states that the implied covenant of good faith and fair dealing cannot be invoked to prevent a court from enforcing the terms of an at will employment contract." *Friend v. United Techs./Hamilton Standard*, No. 92-55864, 1994 U.S. App. LEXIS 9427, at *10 (9th Cir. Apr. 21, 1994). Moreover,

> With regard to an at-will employment relationship, breach of the implied covenant cannot logically be based on a claim that a discharge was made without good cause. If such an interpretation applied, then all at-will contracts would be transmuted into contracts requiring good cause for termination. . . . Because the implied covenant protects only the parties' right to receive the benefit of their agreement, and, in an at-will relationship there is no agreement to terminate only for good cause, the implied covenant standing alone cannot be read to impose such a duty.

*De Horney v. Bank of Am. Nat'l Tr. & Sav. Asso.*, 879 F.2d 459, 466 (9th Cir. 1989) (quoting *Foley*, 254 Cal. Rptr. at 238 n.39). Accordingly, if Plaintiff's Agreement was at-will then a bad faith termination cannot frustrate it.

Plaintiff holds the burden of proving that Labcorp breached the implied covenant of good faith and fair dealing when it terminated her. As such, in order to avoid summary judgment, Plaintiff must come forward with evidence raising a genuine issue of material fact that her employment was subject to for-cause termination. However, it is undisputed that the Agreement was at-will, *see* Kondon Decl. at Ex. F, and therefore Labcorp did not need cause to terminate her. Accordingly, Plaintiff's claim that she was terminated in bad faith fails as a matter of law to establish a claim for breach of the implied covenant of good faith and fair dealing. The Court therefore **GRANTS** Labcorp's motion for summary judgment on this basis.

That said, in opposition Plaintiff argues that Labcorp frustrated her right to 30 days' notice when she was "kicked out" the next business day after receiving the second notice of termination.  *See* Doc. No. 47 at 31.  As noted in Section IV.A, it is undisputed that Labcorp ultimately terminated Plaintiff on September 7, 2018.[13]  *See* SS at Nos. 32–33.  It is further undisputed that the Agreement plainly provides that it may be terminated "[u]pon a thirty (30) day written notice given by either party to the other party . . . ."  Kondon Decl. at Ex. F.  Plaintiff has come forth with evidence that Labcorp frustrated her entitlement to this term when she "returned to work the following Monday September 10th 2018" and her "access card did not work" and the lock to her office had been changed.  *See* Pl. Decl. at ¶ 126.

It is unclear, however, whether the first notice of termination—on June 29, 2018—constituted sufficient written notice such that the 30-day notice began to run.  Accordingly, the Court **DENIES** Labcorp's motion to the extent Plaintiff's claim is based upon a frustration of the 30-day notice provision in the Agreement.

## V. CONCLUSION

Based on the foregoing, the Court **GRANTS IN PART** and **DENIES IN PART** Labcorp's motion for summary judgment.  The Court **GRANTS** summary judgment in Labcorp's favor as to Plaintiff's Cal. Health & Safety Code § 1278.5 and intentional infliction of emotional distress claims.  The Court further **GRANTS** Labcorp summary judgment as to Plaintiff's implied covenant of good faith and fair dealing claim to the extent it is based upon her termination and **DENIES** summary judgment to the extent it is based upon a frustration of the 30-day notice provision of the Agreement.  Finally, the Court **GRANTS** summary judgment in Labcorp's favor as to Plaintiff's Labor Code retaliation claim to the extent it is based upon Plaintiff's internal hotline and CMS

---

[13] The Court's finding in Section IV.A regarding the second notice of termination as the operative termination date is limited to the context of it constituting an adverse employment action under Plaintiff's retaliation claim.

complaints and **DENIES** the remainder of Labcorp's request for summary judgment as to this claim.

Plaintiff's remaining claims must proceed to trial. The Court will issue a separate pretrial scheduling order setting all pertinent deadlines and hearings, including a trial date. The Court **ORDERS** the parties to jointly contact the chambers of the assigned magistrate judge within five business (5) days of the date this Order is filed, for the purpose of scheduling a mandatory settlement conference at the convenience of the magistrate judge.

**IT IS SO ORDERED.**

Dated: August 30, 2021

HON. MICHAEL M. ANELLO
United States District Judge